GRIFFIS, J„
 

 for the Court:
 

 ¶ 1. Wastewater Plant Service Co., Inc. (WPSCO) brought this action against Harrison County Utility Authority (HCUA) after HCUA chose another company’s proposal for the operation and management of HCUA’s wastewater facilities. On appeal by bill of exceptions, the circuit court affirmed HCUA’s decision. WPSCO now appeals, and the appeal has been deflected to this Court for consideration.
 

 FACTS
 

 ¶ 2. HCUA governs Harrison County’s wastewater-treatment system, which includes wastewater-treatment plants and an interceptor system. HCUA is governed by a board of directors (Board), which is comprised of five mayors from cities located in Harrison County and two other representatives.
 

 ¶ 3. From 2000 through 2006, HCUA contracted with WPSCO to provide operation and maintenance services for HCUA’s interceptor system.
 

 ¶ 4. In August 2006, HCUA issued a Request for Proposals (“RFP”) which invited contractors to submit proposals for the operation and maintenance of its wastewater plants and interceptor lines. Proposals could be submitted for only one or for both systems.
 

 ¶ 5. According to the RFP, a mandatory pre-proposal meeting was held on August 16, 2006, at 9:00 a.m. In attendance were
 
 *689
 
 representatives of WPSCO; Operation Technologies, Inc. (Optech); S.H. Anthony (SA); and Severn Trent.
 

 ¶ 6. The submission deadline for proposals was September 15, 2006. HCUA received three proposals. SA, together with Utility Partners (“UP”), submitted a proposal for the operation of both the waste-water system and interceptor system (the “SA/UP” proposal). WPSCO submitted a proposal for the operation of the interceptor system. Optech submitted proposals for the operation of the wastewater system.
 

 ¶ 7. SA’s proposed price was $299,862 per year. WPSCO’s proposed price was $273,843.96 per year. However, the SA/ UP’s proposal included services that were not covered in WPSCO’s proposed cost. The SA/UP proposal included the following services:
 

 (1) infrared surveying of HCUA’s pump stations every three years (for preventative maintenance);
 

 (2) draw[-]down testing of the pump stations (to determine their volume of wastewater flow) by an engineer; and
 

 (3) boom[-]truck utilization.
 

 On September 26, 2006, eleven days after the proposal due date, WPSCO contacted HCUA to state that it would also include the additional services that SA had included in its proposal at no additional cost.
 

 ¶ 8. Thereafter, Optech filed a complaint for a temporary restraining order and a motion for preliminary and/or permanent injunction and damages in the Harrison County Circuit Court. Optech’s suit sought to prevent SA and UP and their officers and employees from entering into negotiations with HCUA for the operation of HCUA facilities. Optech claimed that its former employees had violated the Mississippi Trade Secrets Act when the employees left Optech to work for UP and/or work with SA. WPSCO did not join in the action against SA and UP. On October 2, 2006, the circuit court granted Optech’s ex parte motion for a temporary restraining order.
 

 ¶ 9. Kamram Pahlavan was the Executive Director of HCUA. Pahlavan summarized the proposals to a technical committee of HCUA, which then reviewed the proposals. Pahlavan compared both Op-tech’s and SA/UP’s proposals for the wastewater plants, and WPSCO’s and SA/ UP’s proposals for the interceptor system.
 

 ¶ 10. According to Pahlavan’s summary, SA/UP’s base proposal price was $299,862 per year and included pricing for an infrared survey, draw-down tests, and boom-truck services. WPSCO’s base proposal price was $273,843.96 per year and did not include the infrared survey, draw-down tests, or boom-truck services. Pahlavan also placed a market value on the services which were offered by SA/UP and not by WPSCO:
 

 (1) Every three years, SA/UP will use a third party to perform an infrared survey of all equipment and provide the Utility Authority with a written report of the findings. This service is valued [at] an estimated $10,000-$15,000.
 

 (2) SA/UP includes all costs for draw[-]down testing, performed by a professional engineer, [sic] in the proposal. This service is valued [at] an estimated $8,000-$10,000.
 

 (3) SA/UP will provide the use of a 10-15 ton boom truck with up to 55’ reach for removal of pumps and equipment, as well as said installation of such equipment is included. The Utility Authority spent approximately $10,000 for this service to be provided by vendors.
 

 ¶ 11. On October 5, 2006, the Board met and selected the SA/UP proposal. However, since the temporary restraining order was in effect, the Board mandated
 
 *690
 
 that SA/UP provide evidence of its legal ability to enter into negotiations with HCUA.
 

 ¶ 12. On October 13, 2006, the circuit court dissolved the temporary restraining order and denied Optech’s request for a permanent injunction.
 

 ¶ 13. On October 19, 2006, the Board affirmed its acceptance of SA/UP’s proposal. Thereafter, WPSCO filed a bill of exceptions in the Harrison County Circuit Court to contest HCUA’s actions. In WPSCO’s bill of exceptions, WPSCO did not ask for nor establish “damages”; instead, it asked the court to overturn the HCUA’s decision and award it the contract. The circuit court ruled in favor of HCUA. From this judgment, WPSCO appeals.
 

 STANDARD OF REVIEW
 

 ¶ 14. “When [the appellate Court] reviews a decision by a chancery or circuit court concerning an agency action, [it applies] the same standard of review that the lower courts are bound to follow.”
 
 Miss. Sierra Club, Inc. v. Miss. Dep’t of Envtl. Quality,
 
 819 So.2d 515, 519 (¶ 15) (Miss.2002). Our standard of review from a finding of an administrative agency is limited. Uniform Rule of Circuit and County Court 5.03, entitled “Scope of appeals from administrative agencies,” provides:
 

 On appeals from administrative agencies[,] the court will only entertain an appeal to determine if the order or judgment of the lower authority:
 

 1. Was supported by substantial evidence; or
 

 2. Was arbitrary or capricious; or
 

 3. Was beyond the power of the lower authority to make; or
 

 4. Violated some statutory or constitutional right of the complaining party.
 

 Questions of law will be reviewed de novo.
 
 Smith v. Jackson Constr. Co.,
 
 607 So.2d 1119, 1125 (Miss.1992).
 

 ANALYSIS
 

 ¶ 15. We begin our analysis with a brief explanation of two matters, which aid our review. First, Mississippi Rule of Appellate Procedure 28(a)(3) requires that there be a statement of the issues and “[e]ach issue presented for review shall be separately numbered in the statement.” Rule 28(a)(6) provides that “[t]he argument shall contain the contentions of [the] appellant with respect to the issues presented, and the reasons for those contentions. ...” M.R.A.P. 28(a)(6). The typical interpretation requires a separate argument for each issue. However, there are cases in which it is necessary for a party to combine several issues for argument. This Court attempts to address all of the issues raised by the parties. The Court’s ability to address the issues presented by a party is advanced when the party’s brief provides for argument on each separate issue.
 

 ¶ 16. Here, WPSCO’s brief has combined several issues for argument. For clarity, this opinion quotes WPSCO’s issues verbatim and couples the arguments as WPSCO did in its brief.
 

 ¶ 17. Second, WPSCO attempts to make an issue over whether HCUA’s advertisement was a request for bids and or a request for proposals. WPSCO contends it was a request for bids and not a request for proposals. HCUA claims it was a request for proposals. There is no doubt that HCUA labeled its advertisement as a “Request for Proposals.” Further, there is no doubt that all of the documents indicate that HCUA was considering “proposals.” WPSCO does not argue or cite authority to define the legal significance of its use of the words “bids” as opposed to
 
 *691
 
 the word “proposals.” More disturbing, however, is the fact that WPSCO’s brief often confuses these words, uses them interchangeably, or fails to indicate that there is a separate use and meaning (e.g. the wording of Issue 1 includes the use of both words without a distinction). There is a legal distinction between the words “bid” and “proposal,” and the word which is at issue here is a “proposal.”
 
 [1]
 

 ¶ 18. We now address the issues as presented.
 

 Issue 1. Did HCUA deviate from the requirements laid down in its request for proposals by giving a contract to a bidder who did not have a representative at the mandatory pre-bid meeting?
 

 Issue 2. Did HCUA violate Mississippi Code Annotated [section] 31-3-15 and Mississippi Code Annotated section 31-3-21 by accepting a bid submitted by two corporations “in association” when under the terns of the bid:
 

 12% of the work would be performed by a corporation which had a certificate of responsibility, and 88% of the work would be performed by a corporation tuhich did not have a certificate of responsibility?
 

 ¶ 19. In its argument, WPSCO claims that “UP did not have a representative at the mandatory pre-bid meeting and UP was not qualified to do business in Mississippi — and, thus, did not have a certificate of responsibility on the date the bids were opened.” Therefore, WPSCO makes two separate arguments: UP did not comply with the request for proposals because it did not have a representative present at the mandatory pre-proposal meeting, and the contract between HCUA and SA/UP is void because UP did not have a certificate of responsibility.
 

 ¶ 20. In the RFP, HCUA stated that: “[a] mandatory pre-proposal meeting will be conducted ... [and] all proposers must be represented.” HCUA’s “mandatory pre-proposal meeting” was held on September 15, 2006. WPSCO and SA each had a representative in attendance. UP did not. WPSCO argues that UP was “a contractor” under Mississippi law, and under Mississippi law all “contractors” must be qualified prior to submitting a response, and to be qualified, a “contractor” must attend the mandatory pre-proposal meeting.
 

 ¶21. We note that the RFP also provided that: “The Authority reserves the right ... to waive any informalities deemed to be in the best interest of the Authority.” Therefore, because HCUA, in the RFP, reserved the right to waive any informalities deemed to be in the best interest of the authority, we find that HCUA had the power to waive UP’s nonattendance at the pre-proposal meeting. WPSCO cites no authority for the proposition that the failure to attend the pre-proposal meeting would deny a party the right to enter a bid or proposal. We find no reversible error in WPSCO’s Issue 1.
 

 ¶ 22. Next, WPSCO argues that the HCUA contract with SA/UP is void because UP did not have a certificate of responsibility, as required by Mississippi
 
 *692
 
 Code Annotated sections 31-3-15 and 31-3-21(1) (Rev.2006). Section 31-3-21(1) provides:
 

 It shall be unlawful for any person who does not hold a certificate of responsibility issued under this chapter, or a similar certificate issued by another state recognizing such certificate issued by the State of Mississippi, to submit a bid, enter into a contract, or otherwise engage in or continue in this state in the business of a contractor, as defined in this chapter. Any bid which is submitted without a certificate of responsibility number issued under this chapter and without that number appearing on the exterior of the bid envelope, as and if herein required, at the time designated for the opening of such bid, shall not be considered further, and the person or public agency soliciting bids shall not enter into a contract with a contractor submitting a bid in violation of this section. In addition, any person violating this section by knowingly and willfully submitting a bid for projects without holding a certificate of responsibility number issued under this chapter, as and if herein required, at the time of the submission or opening of such bid shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than One Thousand Dollars ($1,000.00), or by imprisonment for not more than six (6) months, or by both such fine and imprisonment.
 

 WPSCO argues that UP is a contractor because a “contractor” is defined by statute as “[a]ny person contracting or undertaking as prime contractor, subcontractor or sub-subcontractor of any tier to do any erection, building, construction, reconstruction, repair, maintenance or related work on any public or private project less than fifty thousand dollars ($50,000.00)[.]” Miss.Code Ann. § 31-3-1(a) (Rev.2006). Since UP was a contractor under Mississippi law, WPSCO claims that it had to have a certificate of responsibility. If it did not have a certificate of responsibility, UP may not be awarded a contract or any such contract awarded is “null and void.” Miss.Code. Ann. § 31-3-15.
 

 ¶ 23. HCUA responds that UP did not need a certificate of responsibility because the contract was a service contract and service contracts between a private contractor and a public agency do not require the contractor to have a certificate of responsibility. Accordingly, HCUA argues that the contract in issue here is not regulated under Title 31, Chapter 3 of the Mississippi Code.
 

 ¶ 24. A certificate of responsibility is needed to bid on all public or private construction projects in Mississippi unless the project is exempted by statute. Miss. Prac. Enc. Constr. Law, § 5 (2009). The definitions provided in section 31-3-1(a) clearly indicate that the certificate of responsibility statutes under Title 31, Chapter 3 govern what would most typically be referred to as construction projects.
 

 ¶ 25. Though neither the Legislature nor the appellate courts have addressed whether operation of a wastewater facility and interceptor system requires a certificate of responsibility, the Mississippi Attorney General has stated that a private company that is operating and maintaining the municipality’s water system under contract is not required to comply with the public purchasing statutes. Miss. Att’y Gen. Op. No. 2000-0673, 2000 WL 1899949,
 
 Snyder
 
 (Nov. 27, 2000). The Attorney General also found that contracts to extend the water system or make capital improvement do require that the municipality comply with statutes governing public construction.
 
 Id.
 
 In a separate opinion, the Attorney General opined that service contracts which involve non-construction work
 
 *693
 
 between a private contractor and a public body do not require the contractor to possess a certificate of responsibility. Miss. Att’y Gen. Op. No. 2001-0663, 2001 WL 1513805,
 
 Meadows
 
 (Oct. 26, 2001) (maintenance of public beach by private contractor does not require a certificate of responsibility).
 

 ¶ 26. The supreme court has upheld the Mississippi State Board of Contractors’ determination that a contractor was not required to possess a certificate of responsibility for a public contract if less than 50% of the services to be performed under the contract were not of a “maintenance” nature.
 
 Clancy’s Lawn Care & Landscaping, Inc. v. Miss. State Bd. of Contractors,
 
 707 So.2d 1080, 1084 (¶ 14) (Miss.1997). There, the supreme court ruled that “[U]n-der Rule 2(b) of the Rules and Regulations of the Mississippi State Board of Contractors, the Board issues certificates of responsibility to contractors in the following classifications: building construction; highway, street and bridge construction; heavy construction; municipal and public works construction; electrical work; mechanical work; and specialty.”
 
 Id.
 
 at 1084 (¶ 14).
 

 ¶27. We find no authority to support the conclusion that UP was required to have a certificate of responsibility to operate and manage a wastewater facility and interceptor system. It was evident from the RFP and the proposals submitted that the operation and management of the facility was the major component of the project, not its maintenance. Although the RFP does ask for repairs to be made, the repairs contemplated were nothing more than routine and minor repairs. The contract at issue was not for building or constructing, which would require a certificate of responsibility. Accordingly, we find no reversible error in WPSCO’s Issue 2.
 

 Issue 3. Did HCUA violate Mississippi Code Annotated section 31-7-13 subsection (c)(ii) and subsection (d)(i) by awarding a bid based on the perception that the chosen bidder was offering “extras”
 
 — items
 
 separate from and in addition to the items included in the specifications
 
 — when,
 
 in fact, these items were included in the specifications and were offered by other bidders?
 

 Issue L Did HCUA violate Mississippi Code Annotated section 31-7-13 subsection (e)(ii) and subsection (d)(i) by awarding a bid based on the perception that the chosen bidder was offering “extras”
 
 — items
 
 separate from and in addition to the items included in the specifications
 
 — without
 
 amending the specifications and reopening the bidding so that all other bidders could offer revised bids which would include the “extras”?
 

 ¶ 28. In Issues 3 and 4, WPSCO claims that HCUA violated Mississippi Code Annotated sections 31—7—13(c)(ii) and (d)(i) (Rev.2006). This argument relates to “extras” that were contained in the SA/UP proposal but were not found in WPSCO’s proposal.
 

 ¶ 29. The treatment of the “extras” appears to be the same matter of concern in Issues 5, 6 and 7. Accordingly, we consider Issues 3 through 7 together.
 

 Issue 5. Did HCUA act arbitrarily and capriciously by assigning a supposed market values [sic] to the “extras” offered by SA/UP without obtaining any information concerning the current market value of these “extras”?
 

 Issue 6. Did HCUA violate Mississippi Code Annotated section 31-7-13(d)(ii), by failing to adequately explain the calculations used to “adjust” WPSCO’s bid upward and by failing to explain the purported sav
 
 
 *694
 

 ings which HCUA relied upon in deeming the SAJUP bid to be the lowest bid?
 

 Issue 7. Is there any justification for HCUA’s decision to accept the SA/UP bid and reject the WPSCO bid?
 

 ¶ 30. Section 31-7-13 provides the requirements for public purchases:
 

 All agencies and governing authorities shall purchase their commodities and printing; contract for garbage collection or disposal; contract for solid waste collection or disposal; contract for sewage collection or disposal; contract for public construction; and contract for rentals as herein provided.
 

 [[Image here]]
 

 (c) Bidding procedure for purchases over $50,000.00....
 

 [[Image here]]
 

 (ii) Bidding process amendment procedure. If all plans and/or specifications are published in the notification, then the plans and/or specifications may not be amended. If all plans and/or specifications are not published in the notification, then amendments to the plans/specifications, bid opening date, bid opening time and place may be made, provided that the agency or governing authority maintains a list of all prospective bidders who are known to have received a copy of the bid documents and all such prospective bidders are sent copies of all amendments. This notification of amendments may be made via mail, facsimile, electronic mail or other generally accepted method of information distribution. No addendum to bid specifications may be issued within two (2) working days of the time established for the receipt of bids unless such addendum also amends the bid opening to a date not less than five (5) working days after the date of the addendum.
 

 [[Image here]]
 

 (d) Lowest and best bid decision procedure.
 

 (i) Decision procedure. Purchases may be made from the lowest and best bidder. In determining the lowest and best bid, freight and shipping charges shall be included. Life-cycle costing, total cost bids, warranties, guaranteed buy-back provisions and other relevant provisions may be included in the best bid calculation. All best bid procedures for state agencies must be in compliance with regulations established by the Department of Finance and Administration. If any governing authority accepts a bid other than the lowest bid actually submitted, it shall place on its minutes detailed calculations and narrative summary showing that the accepted bid was determined to be the lowest and best bid, including the dollar amount of the accepted bid and the dollar amount of the lowest bid. No agency or governing authority shall accept a bid based on items not included in the specifications.
 

 [[Image here]]
 

 (m) Exceptions from bidding requirements. Excepted from bid requirements are:
 

 (xxii) Garbage, solid waste and sewage contracts. Contracts for garbage collection or disposal, contracts for solid waste collection or disposal and contracts for sewage [sic] collection or disposal.
 

 
 *695
 
 (r) Solid waste contract proposal procedure. Before entering into any contract for garbage collection or disposal, contract for solid waste collection or disposal or contract for sewage collection or disposal, which involves an expenditure of more than Fifty Thousand Dollars ($50,000.00), a governing authority or agency shall issue publicly a request for proposals concerning the specifications for such services which shall be advertised for in the same manner as provided in this section for seeking bids for purchases which involve an expenditure of more than the amount provided in paragraph (c) of this section. Any request for proposals when issued shall contain terms and conditions relating to price, financial responsibility, technology, legal responsibilities and other relevant factors as are determined by the governing authority or agency to be appropriate for inclusion; all factors determined relevant by the governing authority or agency or required by this paragraph (r) shall be duly included in the advertisement to elicit proposals. After responses to the request for proposals have been duly received, the governing authority or agency shall select the most qualified proposal or proposals on the basis of price, technology and other relevant factors and from such proposals, but not limited to the terms thereof, negotiate and enter contracts with one or more of the persons or firms submitting proposals. If the governing authority or agency deems none of the proposals to be qualified or otherwise acceptable, the request for proposals process may be reinitiated.
 

 ¶ 31. WPSCO contends that HCUA violated sections 31-7-13(c) and (d) by not re-opening the bidding so that other bidders could modify their bids and by not stating the reasons for not choosing the lowest bid. HCUA responds that the “extras” were required in the RFP specifications and that WPSCO had the same opportunity as did SA/UP to specify exactly which services it had to offer and at what price.
 

 ¶ 32. WPSCO argues that HCUA should have re-opened the bidding pursuant subsection (e)(ii) and that HCUA violated subsection (d) by not choosing the lowest and best bid. However, we find that neither subsection (c)(ii) nor (d) applies to this contract.
 
 [2]
 
 Subsections (c)(ii) and (d) apply to bidding requirements. This is a contract for a waste-water-treatment system and is specifically exempted from bidding requirements pursuant section 31-7-13(m)(xxii). In lieu of bidding requirements, an agency which contracts for waste collection or disposal must publish a request for proposals. Miss.Code Ann. § 31-7-13(r).
 

 ¶ 33. Next, WPSCO claims that HCUA acted arbitrarily and capriciously when the HCUA engineer evaluated the three “extras” as having a market value of between $28,000 and $35,000 and by adjusting WPSCO’s bid upward by $30,000. HCUA responds that these “extras” were not “extras” but were three differences between SA/UP and WPSCO’s proposals.
 

 ¶ 34. HCUA’s executive director Pahla-van evaluated the proposals and summarized the key differences. The differences he found were:
 

 1) Every three years, SA/UP will use a third party to perform an infrared survey of all equipment and provide the Utility Authority with a written report
 
 *696
 
 of the findings. This service is valued [at] an estimated $10,000-$15,000.
 

 2) SA/UP includes all costs for draw-down testing, performed by a professional engineer, are included in the proposal. This service is valued [at] an estimated $8,000-$10,000.
 

 3) SA/UP will provide the use of a 10-15 ton boom truck with up to 55’ reach for removal of pumps and equipment, as well as said installation of such equipment is included. The Utility Authority spent approximately $10,000 for this service to be provided by vendors.
 

 ¶ 35. Pahlavan’s estimated adjustment of WPSCO’s bid was not arbitrary and capricious. WPSCO’s claims that he was not in the position to make the estimates and to assign a market value are unsupported by the evidence. WPSCO failed to cite any authority for its assertion. Pahla-van, as the executive director of HCUA and an experienced engineer, had the authority to compare the proposals and estimate the market price of the differences in the proposals. Accordingly, Pahlavan’s estimation of the price differences was not arbitrary and capricious.
 

 ¶ 36. Lastly, WPSCO argues that there was no justification in awarding SA/UP the contract because WPSCO’s proposal was the lowest price. However, the RFP stated that HCUA reserved the right to reject any proposal and “to award the contract to the offeror whose proposal is determined to be most advantageous to HCUA, taking into account price and other evaluation factors.” Accordingly, WPSCO and SA/UP were on notice that price would not be the deciding factor.
 

 ¶ 37. The Board listed the reasons it chose SA/UP, which included:
 

 (1) the combination in one RFP of the plant operation and interceptor lines, which will facilitate smoother operation because of less employees, and could save money due to such combination and (2) the use of the boom truck, being more affordable and the use of which will substantially facilitate ongoing maintenance of pump stations.... The expression of qualifications, quality, and service and price of the RFP from S.H. Anthony and Utility Partners were factors considered by the board when it determined them the lowest and best alternative proposal.
 

 ¶ 38. Pursuant section 31-7-13(r), “the governing authority or agency shall select the most qualified proposal or proposals on the basis of price, technology and other relevant factors and from such proposals, but not limited to the terms thereof[.]” The price was just one factor for the Board to consider. The Board considered other factors such as efficiency, qualifications, and quality. Accordingly, we find that the record supports a finding that the Board’s decision was informed and based on substantial evidence. Accordingly, we find that Issues 3 through 7 have no merit.
 

 ¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, BARNES, ROBERTS AND MAXWELL, JJ„ CONCUR. ISHEE AND CARLTON, JJ, NOT PARTICIPATING.
 

 [1]
 

 . The RFP here was a contract for the operation and maintenance solid waste. A contract for the operation and maintenance of solid waste is exempt from bidding requirements. Miss.Code Ann. § 31-7-13(m)(xxii) (Supp.2009). "Before entering into any contract for garbage collection or disposal, contract for solid waste collection or disposal or contract for sewage collection or disposal, which involves an expenditure of more than Fifty Thousand Dollars ($50,000.00), a governing authority or agency shall issue publicly a request for proposals[.]” Miss.Code Ann. § 31-7-13(r).
 

 [2]
 

 . Subsection (c)(i) only governs the advertising requirements for waste contracts. Miss. Code. Ann. § 31—7—13(r).